# SUPREME COURT OF THE UNITED STATES

CITY OF TAHLEQUAH, OKLAHOMA, ET AL. *v.* AUSTIN
P. BOND, AS SPECIAL ADMINISTRATOR OF THE ESTATE OF
DOMINIC F. ROLLICE, DECEASED

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 20–1668.   Decided October 18, 2021

PER CURIAM.

On August 12, 2016, Dominic Rollice's ex-wife, Joy, called 911. Rollice was in her garage, she explained, and he was intoxicated and would not leave. Joy requested police assistance; otherwise, "it's going to get ugly real quick." 981 F. 3d 808, 812 (CA10 2020). The dispatcher asked whether Rollice lived at the residence. Joy said he did not but explained that he kept tools in her garage.

Officers Josh Girdner, Chase Reed, and Brandon Vick responded to the call. All three knew that Rollice was Joy's ex-husband, was intoxicated, and would not leave her home.

Joy met the officers out front and led them to the side entrance of the garage. There the officers encountered Rollice and began speaking with him in the doorway. Rollice expressed concern that the officers intended to take him to jail; Officer Girdner told him that they were simply trying to get him a ride. Rollice began fidgeting with something in his hands and the officers noticed that he appeared nervous. Officer Girdner asked if he could pat Rollice down for weapons. Rollice refused.

Police body-camera video captured what happened next. As the conversation continued, Officer Girdner gestured with his hands and took one step toward the doorway, causing Rollice to take one step back. Rollice, still conversing with the officers, turned around and walked toward the back of the garage where his tools were hanging over a

workbench. Officer Girdner followed, the others close behind. No officer was within six feet of Rollice. The video is silent, but the officers stated that they ordered Rollice to stop. Rollice kept walking. He then grabbed a hammer from the back wall over the workbench and turned around to face the officers. Rollice grasped the handle of the hammer with both hands, as if preparing to swing a baseball bat, and pulled it up to shoulder level. The officers backed up, drawing their guns. At this point the video is no longer silent, and the officers can be heard yelling at Rollice to drop the hammer.

He did not. Instead, Rollice took a few steps to his right, coming out from behind a piece of furniture so that he had an unobstructed path to Officer Girdner. He then raised the hammer higher back behind his head and took a stance as if he was about to throw the hammer or charge at the officers. In response, Officers Girdner and Vick fired their weapons, killing Rollice.

Rollice's estate filed suit against, among others, Officers Girdner and Vick, alleging that the officers were liable under 42 U. S. C. §1983, for violating Rollice's Fourth Amendment right to be free from excessive force. The officers moved for summary judgment, both on the merits and on qualified immunity grounds. The District Court granted their motion. *Burke* v. *Tahlequah*, 2019 WL 4674316, \*6 (ED Okla., Sept. 25, 2019). The officers' use of force was reasonable, it concluded, and even if not, qualified immunity prevented the case from going further. *Ibid.*

A panel of the Court of Appeals for the Tenth Circuit reversed. 981 F. 3d, at 826. The Court began by explaining that Tenth Circuit precedent allows an officer to be held liable for a shooting that is itself objectively reasonable if the officer's reckless or deliberate conduct created a situation requiring deadly force. *Id.,* at 816. Applying that rule, the Court concluded that a jury could find that Officer Girdner's

initial step toward Rollice and the officers' subsequent "cornering" of him in the back of the garage recklessly created the situation that led to the fatal shooting, such that their ultimate use of deadly force was unconstitutional. *Id.,* at 823. As to qualified immunity, the Court concluded that several cases, most notably *Allen* v. *Muskogee*, 119 F. 3d 837 (CA10 1997), clearly established that the officers' conduct was unlawful. 981 F. 3d, at 826. This petition followed.

We need not, and do not, decide whether the officers violated the Fourth Amendment in the first place, or whether recklessly creating a situation that requires deadly force can itself violate the Fourth Amendment. On this record, the officers plainly did not violate any clearly established law.

The doctrine of qualified immunity shields officers from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson* v. *Callahan*, 555 U. S. 223, 231 (2009). As we have explained, qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia* v. *Wesby*, 583 U. S. \_\_\_, \_\_\_ –\_\_\_ (2018) (slip op., at 13–14) (quoting *Malley* v. *Briggs*, 475 U. S. 335, 341 (1986)).

We have repeatedly told courts not to define clearly established law at too high a level of generality. See, *e.g.*, *Ashcroft* v. *al-Kidd*, 563 U. S. 731, 742 (2011). It is not enough that a rule be suggested by then-existing precedent; the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 583 U. S., at \_\_\_ (slip op., at 14) (quoting *Saucier* v. *Katz*, 533 U. S. 194, 202 (2001)). Such specificity is "especially important in the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer

confronts." *Mullenix* v. *Luna*, 577 U. S. 7, 12 (2015) (*per curiam*) (internal quotation marks omitted).

The Tenth Circuit contravened those settled principles here. Not one of the decisions relied upon by the Court of Appeals—*Estate of Ceballos* v. *Husk*, 919 F. 3d 1204 (CA10 2019), *Hastings* v. *Barnes*, 252 Fed. Appx. 197 (CA10 2007), *Allen*, 119 F. 3d 837, and *Sevier* v. *Lawrence*, 60 F. 3d 695 (CA10 1995)—comes close to establishing that the officers' conduct was unlawful. The Court relied most heavily on *Allen*. But the facts of *Allen* are dramatically different from the facts here. The officers in *Allen* responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hands. 119 F. 3d, at 841. Officers Girdner and Vick, by contrast, engaged in a conversation with Rollice, followed him into a garage at a distance of 6 to 10 feet, and did not yell until after he picked up a hammer. We cannot conclude that *Allen* "clearly established" that their conduct was reckless or that their ultimate use of force was unlawful.

The other decisions relied upon by the Court of Appeals are even less relevant. As for *Sevier*, that decision merely noted in dicta that deliberate or reckless preseizure conduct can render a later use of force excessive before dismissing the appeal for lack of jurisdiction. See 60 F. 3d, at 700–701. To state the obvious, a decision where the court did not even have jurisdiction cannot clearly establish substantive constitutional law. Regardless, that formulation of the rule is much too general to bear on whether the officers' particular conduct here violated the Fourth Amendment. See *al-Kidd*, 563 U. S., at 742. *Estate of Ceballos*, decided after the shooting at issue, is of no use in the clearly established inquiry. See *Brosseau* v. *Haugen*, 543 U. S. 194, 200, n. 4 (2004) (*per curiam*). And *Hastings*, an unpublished decision, involved officers initiating an encounter with a potentially suicidal individual by chasing him into his bedroom, screaming at him, and pepper-spraying him. 252 Fed.

Per Curiam

Appx., at 206. Suffice it to say, a reasonable officer could miss the connection between that case and this one.

Neither the panel majority nor the respondent have identified a single precedent finding a Fourth Amendment violation under similar circumstances. The officers were thus entitled to qualified immunity.

The petition for certiorari and the motions for leave to file briefs *amici curiae* are granted, and the judgment of the Court of Appeals is reversed.

*It is so ordered.*